**Kerns v. Hornberger**

*Eleni Dimitriou Geishauser,* for plaintiff.
*Jaimee A.M. Dautrich,* for defendant.

LASH, *J.,* January 4, 2008—The matters before this court are the petitions of defendant, Shaun Hornberger (Father), to modify custody order and a corresponding petition of Father to hold plaintiff, Lacey I. Kerns (Mother), in contempt of court. At the time of trial, held on December 18, 2007, the parties were governed by a

custody order entered by agreement on May 31, 2002, setting forth rights and duties regarding the parties' minor child, Matthew Hornberger, born December 1, 1998. This court enters the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Lacey I. Kerns (Mother), is an adult individual who resides at 112 South 20th Street, Reading, Berks County, Pennsylvania 19606.

(2) Defendant, Shaun Hornberger (Father), is an adult individual who resides at 101 South Furnace Street, Birdsboro, Berks County, Pennsylvania 19508.

(3) The parties are the natural parents of Matthew Hornberger (minor child), born December 1, 1998.

(4) The parties were never married.

(5) Mother currently resides with the minor child and her other child, Breyana L. Garman, born March 17, 2003, the child of Mother and Dennis Garman Jr.

(6) Father currently resides with his wife, Brooke, a child of the marriage, Kendall, who is 6 months old, and Brooke's son, Krystian, age 4. The couple has lived together since November 29, 2005.

(7) Regarding the child, Krystian, Father stands in the status of in loco parentis, having signed an acknowledgment of paternity in the context of child support proceedings, though both he and Brooke acknowledge that he is not the natural father, and though no formal adoption proceedings were ever instituted.

(8) Mother currently resides in the Antietam School District.

(9) Father currently resides in the Daniel Boone School District.

(10) The parties previously lived together, commencing in January 1998. It is unclear when the parties separated, Mother believing it to have occurred in 2000 and Father in 2002. However, in Mother's original complaint for custody, she alleges that the separation took place on April 14, 2002.

(11) On or about May 31, 2002, the parties entered an agreed custody order by agreement, setting forth, inter alia, that the parties would share legal custody, that Mother would have primary physical custody and that Father would have partial custody of the minor child on alternating weekends commencing Friday at 6 p.m. until Sunday at 6 p.m., and have the minor child every Monday, Tuesday, Wednesday and Thursday from 5 p.m. until 10 p.m.

(12) Until the filing of the within petition to modify, neither party moved to have the custody order amended, although by informal agreement, they deviated from the terms of the order. Currently, Mother retains primary custody, with Father having custody of the minor child on alternate weekends and every Tuesday and Thursday evening.

(13) Mother currently is employed at Spectrum Community Services, working Monday through Friday from 8 a.m. until 4 p.m., and Daysprings Homes on alternate Saturdays, when she does not have the minor child, from 7 a.m. to 3 p.m.

(14) Her job duties include providing care for developmentally disabled adults. She has received extensive

training, including first aid, CPR, non-violence crisis intervention, and medical treatment training.

(15) Father currently is employed by Supply One Plastics working from 6 a.m. to 4 p.m., Monday through Thursday. His work schedule is flexible in that he is permitted to change his schedule to five eight-hour days Monday through Friday from 8 a.m. to 4 p.m., which he states he will do if he obtains primary custody of the minor child.

(16) Mother has the minor child enrolled in daycare at the Trinity Learning Center located in Mount Penn, Berks County, Pennsylvania. She utilizes the daycare for a short time in the mornings before school, dropping the minor child off at 7 a.m., and after school on weekdays when Father does not have the minor child, with the bus dropping the minor child off at the daycare center, and mother picking the minor child up at about 4:15 p.m.

(17) Since the parties' separation, apparently on April 14, 2002, Mother and the minor child have resided at various residences. Mother first moved to 14 Belvedere Avenue, Reading, Berks County, Pennsylvania 19611. Sometime later in 2002, Mother moved in with Dennis Garman Jr., residing at 227 South Wyomissing Avenue, Shillington, Berks County, Pennsylvania, until August 6, 2004.

(18) On August 6, 2004, Mother and Dennis Garman Jr. filed petitions for protection from abuse against each other, receiving temporary orders from this court. Mr. Garman was evicted from the residence, and Mother continued to reside there. Ultimately, Mother and Mr. Garman withdrew their respective protection from abuse

orders against each other, with the orders to vacate being entered September 8, 2004.

(19) At some point in time, probably in the fall of 2004, Mother and Dennis Garman Jr. began residing together again, this time at 314 South 18th Street, Reading, Berks County, Pennsylvania. The cohabitation continued until December 1, 2004, when Mother and Mr. Garman filed second protection from abuse petitions against each other. Temporary orders were granted on December 1, 2004, and Mr. Garman was evicted from the residence.

(20) Shortly thereafter, Mother moved in with her sister at 3507 Penn Avenue, West Lawn, Berks County, Pennsylvania, until sometime in October 2005. At that time, Mother moved into 1029 Fern Avenue, Kenhorst, Berks County, Pennsylvania, the home of the parents of Dennis Garman Jr., although Mother and Dennis Garman Jr. continued to be estranged.

(21) In early 2006, Mother moved from the Garman residence to 217 Upland Avenue, Reading, Berks County, Pennsylvania 19611. She remained there until she was notified by the owner that the owner intended to sell the premises and that Mother would have to move. Mother then moved to her current residence at 112 South 20th Street, Reading, Berks County, Pennsylvania 19606, where she currently resides.

(22) Mother is renting her current residence, but is in the process of obtaining a mortgage to purchase the premises with her mother, the maternal grandmother, as a co-signer.

(23) As a result of Mother's relocations, the minor child has attended school in several different school

districts. He attended pre-kindergarten at Millmont Elementary. He began kindergarten in Cumru Elementary, then returned to Millmont Elementary. In 2005, he commenced first grade at the Green Valley Elementary School in the Wilson School District. When Mother moved to 217 Upland Avenue, Reading, Berks County, Pennsylvania, she attempted to have the minor child readmitted to the Millmont Elementary School. That school was at full capacity so the minor child attended Thomas Ford. In second grade, the minor child was able to attend the Millmont School. Based on Mother's relocation to the Antietam School District, the minor child commenced third grade at Mount Penn Elementary, which he now attends.

(24) In the case of *Lacey Kerns v. Dennis Garman Jr.,* in the Common Pleas of Berks County, docket no. 04-10779, I.D. no. 3, this court issued a decision and order dated August 8, 2006. That decision and order is incorporated herein by reference.

## II. DISCUSSION

At issue is primary physical custody. In determining primary custody, this court considered the testimony of the parties, Albert Schade Jr., a private investigator retained by Father, and the paternal grandmother, Pauline Hornberger, as well as documents and exhibits submitted by the parties. The court also considered an in camera conference with the minor child.

Father presented several reasons in support of his position to obtain primary custody. First, he argued that he would be able to provide a much more stable environment for the minor child. He owns his home in the Bor-

ough of Birdsboro. For his entire life, he and his wife have resided in the Daniel Boone School District and have no intention of moving elsewhere. His parents live close by and are available at any time to care for the minor child when necessary. In contrast, Mother's relocations have resulted in the minor child moving from one school district to another. Father counts seven moves altogether, which is noteworthy considering the minor child is now in the third grade.

Secondly, Father is concerned about the continued presence of Dennis Garman Jr. in Mother's household. Through his investigator, Father was able to establish that Mr. Garman, at least from September 2007, has been present at the household on many occasions. Mother acknowledges that Mr. Garman comes by, but maintains that they are only friends and that he is there either to see his child, or to assist her when necessary, such as when she had the flu or a root canal treatment.

In any event, Father is concerned about Dennis Garman Jr.'s use of drugs, which he learned about through the custody proceeding between Mother and Dennis Garman Jr. Additionally, in one of her protection from abuse petitions, dated April 12, 2006, Mother stated that Dennis Garman "has been abusive to the children and me." Although she did not reference the subject minor child by name, since she has only two children, it is clear that this statement included the minor child.

Father also wants the minor child to be able to spend more time with his half-sister and stepbrother. He testified that the subject minor child gets along very well with both children. Father would also like to see the minor child spend more time with the paternal grandparents.

Both grandparents, and especially the paternal grandmother, have developed a close relationship with the minor child. Grandmother teaches piano to children and would like to start the minor child on piano lessons. She has also featured the minor child and his dog in a children's book which she was involved in publishing.

Father cites his relationship with his minor child as appropriate. They interact in several ways, such as playing disc golf, board games and video games. Father disciplines the minor child by using timeouts for brief periods. He complains, however, about not having enough time. For this reason, he did not want doctors' appointments or activities scheduled during his time, because that takes away from his interaction with the minor child.

Mother believes that she should retain primary custody. She has been the primary custodian since the parties' separation and has always been the person handling the minor child's day-to-day maintenance. She oversees the doctors' appointments, school visits, with the exception of dental appointments, which have been taken over by Father recently. She attempts to communicate with Father, previously utilizing a notebook recommended by the custody master, or through phone contact, but argues that this has been undermined by Father who refuses to discuss matters with her.

Mother and the minor child have a very close and loving relationship. This has never changed, despite the several relocations and Mother's different relationships. She believes the minor child is thriving, citing his excellent grades in school. She believes the minor child's

preference is to reside with her. The minor child is also very close with his half-sister, Breyana.

Regarding her relationship with Dennis Garman Jr., she states that they are currently friends. In the past, particularly during the pendency of the custody action between the two, Mother and Mr. Garman were unable to get along and had several incidents which led to court proceedings. There were allegations of abuse and drug use. The relationship was on-again, off-again and often volatile. Mother states that since the custody decision, she and Mr. Garman have decided to work together for the benefit of their child. There have been no problems of late. Mother has not admitted that she is continuing a relationship with Mr. Garman, but has stated that he comes over to the house and assists her on several matters and visits with his child.

Further, Mother states that there is limited contact between the subject minor child and Mr. Garman and that she is always present during these contacts. Mother states that Dennis Garman Jr. does not use drugs in her presence and, therefore, not in the minor child's presence. If Mr. Garman still uses drugs, Mother is not aware of it. She points out, however, that Father smoked marijuana in the presence of the minor child when the minor child was very young, presenting corroboration through photographs.

Regarding her relocations, she cites that she had legitimate reasons for making the moves. Moreover, she has now achieved stability in that she is in the process of purchasing a residence with her mother as a co-signer. The implication is that the minor child would con-

tinue to attend school in the Antietam School District from this point forward.

Regarding Father, Mother believes that Father should have liberal partial custody time with the minor child, but not primary custody. For several years from the time of separation until as late as 2006, Mother and Father were friendly and able to work through things. However, in 2006, Father's attitude changed. He became demanding and uncooperative. He brought her to court through several different avenues, primarily over support issues, including one relating to his allegation that she forged daycare receipts to obtain a higher support payment. Ironically, at or about the time the litigation between Mother and Mr. Garman subsided, Father commenced his actions against Mother, including the within matters before this court.

Mother also states that Father's wife has been uncooperative during the exchange of the minor child and that Father has also become uncooperative. Mother states that when she would come to the house, she or her friend would knock on the door but there would be no answer for some time, even during adverse weather conditions. She states she had to wait for the minor child for anywhere from five to 30 minutes before the minor child would come out. Ultimately, Father required Mother to have the exchange at a police office a block away, stating that he did not want Mother or her friend banging on the door and waking up his infant child.

Mother also questions Father's investment in the minor child. He does not attend doctors' visits, including some important visits with the ear, nose and throat doctor when the minor child was being checked for hearing deficien-

cies. On one occasion when an appointment was scheduled during Father's time with the minor child, Father objected. Mother is also concerned that Father belittles Mother in the presence of the minor child.

Mother also alleges that Father uses excessive discipline with the minor child. She believes that he will scream at the minor child when he misbehaves, sometimes grabbing him by the shirt and pushing him up against the wall.

Mother also argues that Father's true agenda in filing to modify custody is to decrease his support obligation. During the same period of time that Father became uncooperative and filed his petition to modify custody, a support matter was pending before the court.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

Looking first at Mother's history as primary caretaker, we find both positives and negatives. She is a loving and nurturing parent. The minor child has an excellent relationship with her and is doing well in school. Despite the history of paramours and relocations, and considering that she has been employed full-time while managing a household where she was the primary custodian of two

children, she has, in some respects, done remarkably well.

On the other hand, the relocations cannot be beneficial to either of her two children. Further, this court is cognizant of the extensive drama involved in her relationship with Dennis Garman Jr., as more fully set forth in this court's opinion in disposition of their custody case. Mother's uneven history is in contrast to the level of stability which Father can offer. Father's homeownership, intact marriage, commitment to remaining in the Daniel Boone Area, and the proximity of the paternal grandparents who present an excellent resource, are positive considerations. Thus, while Mother has established and developed parameters for the day-to-day care of the minor child, Father could provide an established home environment.

In making an award, continuity and stability are important elements in a young child's emotional development. *Witmayer v. Witmayer,* 320 Pa. Super. 372, 467 A.2d 371 (1983). We also observe, however, that continuity is but one factor to consider in determining primary custody of the minor child. When considering the evidence in the context of other factors which impact on the minor child's well-being, Father's presentation appears remarkably unimpressive.

For one, his sense of priority regarding the needs of the minor child is misplaced. For example, his lack of attention to the minor child's medical issues regarding his hearing loss was remarkable. Mother scheduled several appointments with the ENT doctor for diagnosis and treatment. Father did not attend these important meetings. Further, when one of the appointments was scheduled

during Father's time, Father complained of being deprived of quality time with the minor child. This unfortunate attitude demonstrates Father's egocentrism regarding his relationship with the minor child, in essence, considering the custody time "his time" and not the minor child's time. This problem also appears in the disparity in day-to-day maintenance, with Mother being perceived as being the responsible party for the huge percentage of these concerns.

This court also questions why the relationship with the parties has deteriorated within the last two years. Previous to that, from the time of separation in 2002 until sometime in 2006, the parties worked together well, which could only benefit the minor child. This has now changed, and it appears that Father is primarily responsible for this change. Father now has a wife and a new family, including an infant child, and appeared to not want to be "interrupted" by Mother and her agenda. This has resulted in difficulties in transferring the minor child, including an episode where Father insisted that the parties drive a block from Father's house to a police station so that the transfer could be made there, even though all parties were present to make the transfer at Father's house. This has also resulted in an inability to communicate. Father's wife has interjected herself into the interaction of the parties, which has contributed to the negativity. Father filed several legal actions against Mother on relatively minor matters which should have been worked out informally. In essence, Father does not recognize that he is required to deal with Mother on an even-handed basis, as she is the mother of one of his children, not merely an unfortunate inconvenience.

Father must be held primarily culpable for the parties' difficulties in communicating. It is clear that he does not want to hear from Mother and is not interested in making communication any easier. The custody master provided a good recommendation for the parties to communicate by notebook, passing the notebook back and forth when they transfer the minor child. Father unilaterally put a stop to this, claiming that he did not like what was written by Mother, that he did not want to have to "respond to lies." This court has reviewed the notebook and does not see any entries made by Mother which are inappropriate. Again, it appears more likely that Father simply does not want to "take the time" to communicate in this manner, as this would take away from "his" time with the minor child.

A good portion of Father's presentation dwelled on the continuing interaction of Mother and Dennis Garman Jr. Father did sufficiently establish that Mr. Garman is present in Mother's household on a frequent basis. What he did not establish, however, is that Mr. Garman's presence has currently had any negative impact on the minor child. He instead relies on Mother's previous allegations that Mr. Garman was a drug user and the record from the custody hearing between Mother and Mr. Garman.

In the past, these issues were substantial. However, during this same period, Mother and Father frequently communicated, the parties being friendly, Mother advising Father of her difficulties during this period. Father knew, or should have known, of the problems existing in Mother's household at that time and should have raised his concerns, if he had them, when the incidents were occurring. Instead, Father waited until 2007 to raise these

matters, after his relationship with Mother had deteriorated, after his new family was established and Mother became a "fifth wheel."

On this issue, Mother testified that her relationship with Dennis Garman Jr. is much better, and that she, nevertheless, does not have Mr. Garman around the subject minor child. There is no evidence to contradict her statements. Further, we note that the detective who was present at Mother's house on numerous occasions and observed Mr. Garman's comings and goings, apparently did not witness any problems or disturbances, otherwise he would have so testified. There have been no legal actions between Mother and Mr. Garman of late, in contrast to the legal claims that existed in the past. Mother and Mr. Garman appear to have a more mature relationship at this time, which benefits the minor child and Mother's other child, Breyana. Nevertheless, if there are further problems, this court can certainly revisit the appropriateness of the custody order for either the subject minor child or Breyana.

We note that the strength of a child's relationship with each parent is a critical factor in custody determinations. *Mahoney v. Mahoney,* 354 Pa. Super. 585, 512 A.2d 694 (1986). If the primary caretaker has attended to the child's physical needs and has exhibited love, affection, concern, tolerance, discipline and a willingness to sacrifice, the court may predict that those qualities will continue. *Stolarick v. Novak,* 401 Pa. Super. 171, 584 A.2d 1034 (1991). Where natural parents are both fit, the trial court must give positive consideration to the parent who has been the primary caretaker. *Commonwealth ex rel Jordan v. Jordan,* 302 Pa. Super. 421, 448 A.2d 1113 (1982).

The evidence in this case does not warrant a change in primary custody. The primary evidence in Father's favor concerns Mother's moves versus his long-standing stability in a community. The other factors militate in favor of Mother. As the parties have worked out an arrangement modifying the previous order of this court, this court will enter a new order in accordance with the parties' arrangement.

We turn then to Father's contempt petition. Father accuses Mother of violating the existing court order of May 31, 2002 by unilaterally deciding, then notifying Father, that she intended to take the minor child for vacation for two consecutive weeks. Father never agreed to this arrangement. The court order had no specifications for vacation. Further, Father believes that the cited reason of "vacation" was merely a ploy, as Mother was relocating to the Antietam School District during this time. Father was unable to communicate with Mother or the minor child and was not aware of the minor child's whereabouts during this period.

This incident is a composite of the deterioration in the parties' ability to communicate. Clearly, Mother should not have disregarded the parties' custody arrangement by taking the minor child for two weeks without Father's consent. Additionally, Father should have been apprised of the minor child's whereabouts at all times.

Father is correct that the custody order does not provide for extended vacation time with one parent and the minor child. On the other hand, the parties have not followed the court order for some time, making an alterative arrangement that has suited them better. Based on all circumstances, it would be appropriate for Father to re-

ceive two weeks make-up time which he can take as additional vacation time. He can either take two weeks in 2008 or one week in 2008 and one week in 2009. He shall provide written notice of his intentions to Mother.

We enter the following order:

## ORDER

And now, January 4, 2008, after trial held, custody of the parties' minor child, Matthew Hornberger, born December 1, 1998, (minor child), shall be as follows:

(1) The parties shall share legal custody of the minor child.

(2) Plaintiff, Lacey I. Kerns (Mother), shall have primary physical custody of the minor child.

(3) Defendant, Shaun Hornberger (Father), shall have partial custody of the minor child on alternate weekends, on the same weekends currently established, from Friday at 4:30 p.m. to Sunday at 6 p.m., and every Tuesday and Thursday from 4:30 p.m. to 8 p.m., and at such other times as the parties may agree.

(4) On weekdays during the school year, the paternal grandparents may pick up the minor child from school and provide daycare services for the minor child until Mother can pick up the minor child at the paternal grandparents' home on weeknights she has the minor child, and Father can pick up the minor child on weeknights he has the minor child.

(5) Mother shall be entitled to custody of the minor child on Mother's Day and Father on Father's Day from 9 a.m. to 6 p.m. each year.

(6) The parties shall alternate Christmas each year such that Mother shall have custody of the minor child from Christmas Eve at 2 p.m. to Christmas Day at 2 p.m., then Father shall have Christmas Day from 2 p.m. to December 26 at 2 p.m. on odd-numbered years, with the parties to reverse the schedule on even-numbered years.

(7) The parties shall alternate the following named holidays, with Mother having the next holiday after the date of this order, Easter, Memorial Day, July 4th, Labor Day and Thanksgiving, from 9 a.m. to 8 p.m.

(8) Each party shall be entitled to two weeks vacation time with the minor child. The vacationing party shall provide 60 days written notice to the non-vacationing party of the dates and times for said vacation. If the proposed vacation times conflict, Mother shall have priority in odd-numbered years and Father in even-numbered years. In addition, Father shall receive two weeks vacation time as make-up, pursuant to the petition for contempt filed by Father. Father may choose to take two additional weeks in 2008 or one additional week in 2008 and one in 2009. He shall provide 60 days written notice to Mother of the dates and times for his make-up time.

(9) The holiday and vacation schedules shall take precedence over the regular custody schedule.

(10) In the event the party having custody of the minor child seeks someone to care for the minor child, the custodial parent shall first contact the other parent to determine whether the other parent can watch the minor child. The paternal grandparents shall also be considered a resource for watching the minor child whenever they

are available, assuming the non-custodial parent cannot watch the minor child.

(11) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall

immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the children/child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

396

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.